UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WILLIAM A. WHITE,

     Plaintiff,

v.                           Case No: 6:14-cv-936-JSS-RMN

DONALD ESLINGER, RONALD
SHAW, JOSEPH KLINGER, and
DENNIS LEMMA,

     Defendants.
_____/

## **ORDER**

Plaintiff, William A. White, a prisoner proceeding pro se, and Defendants, Donald Eslinger, Ronald Shaw, and Joseph Klinger in their individual capacities and Dennis Lemma in his official capacity, have filed cross-motions for summary judgment. (*See* Dkts. 630, 645; *see also* Dkts. 635, 646–48, 650–60, 666, 681, 684, 698, 702.) Upon consideration, for the reasons outlined below, the court denies Plaintiff's motion and grants in part and denies in part Defendants' motion.

## **BACKGROUND**

In presenting the pertinent background information, the court first considers Plaintiff's allegations as set forth in the operative seventh amended complaint. (Dkt. 250.) The court then discusses additional facts supported by other materials in the record. (*E.g.*, Dkts. 635, 648, 651, 652, 655, 656.)

## A. Plaintiff's Allegations

Plaintiff sues Defendants in connection with events that took place in 2014, when Plaintiff was a federal inmate in the custody of the United States Marshal Service (USMS) but was housed at a state correctional facility. (Dkt. 250 at 15.) The operative complaint contains Plaintiff's "aver[ments] under penalty of perjury." (*Id.* at 23.) Plaintiff states that on May 13, 2014, he was transferred from the custody of the Bureau of Prisons to the custody of the USMS. (*Id.* at 15.) Plaintiff further states that the correctional facility had two types of segregation units: B-Pod, with approximately eighty beds, and isolation, with approximately forty beds. (*Id.* at 16.)

Plaintiff describes the conditions in the isolation units as follows:

a) [r]educed [e]nvironmental [s]timuli;

b) two painfully bright[,] double[-]bulbed[,] approximately [six- to eight-foot] fluorescent lights producing approximately 6[,]000 lumens of light[—]the equivalent of a car's high beams[—]which were never dimmed[] and[] which caused substantial pain to the eyes[] and[] head;

c) [twenty-four]-hour[-a-]day monitoring by video[ ]camera, with images from said camera being broadcast throughout the . . . [f]acility, including to visitors, other inmates, and[] the general public[—]both in the "control" areas[] and[] elsewhere[] and[] including times when inmates were urinating[ or] defecating[] or[ were] undressed; [and]

d) a windowless[,] bare room[,] approximately [seven feet by seven feet] in ISO-1, larger in the unit designated ISO-2, with walls painted a bright, glossy white.

(*Id.*)

According to the operative complaint, although Plaintiff was initially placed

among the general population, Defendants ordered him transferred on May 20, 2014, to the facility's ISO-1 unit. (*Id.* at 15–17.) Plaintiff claims that Defendants knew "of the danger that [the ISO] conditions posed" and acted "with willful[] and[] wanton[] disregard for that danger." (*Id.* at 17.) Plaintiff further claims that "[t]he extreme brightness of the lights, particularly combined with [his] existing dysesthesia, caused [him] extreme physical pain[] and[] rendered [him] unable to sleep, eventually causing a serious physical brain injury." (*Id.*)

Plaintiff states that on June 6, 2014, he met with Shaw, who informed Plaintiff that Shaw and Eslinger "jointly decided not to alter [Plaintiff's] conditions." (*Id.* at 18.) "As a result of the lights, pain, [reduced environmental stimuli] conditions, and[] sleep deprivation," Plaintiff avers, he "suffered physical brain damage that caused [him] to lapse into a state of persistent delirium, dissociation, and[] confusional psychosis." (*Id.*)

Plaintiff asserts that on June 18, 2014, due to his erratic behavior, he was transferred to the ISO-2 unit. (*Id.*) Plaintiff further asserts that on June 21, 2014, Jesus Fuentes-Rivera, a nurse at the correctional facility, informed Plaintiff of two facts: (1) Eslinger and Shaw had been told that the conditions of Plaintiff's confinement posed a serious risk to Plaintiff's health, and (2) the facility's medical staff had requested that Plaintiff be assigned to another housing unit for health reasons. (*Id.* at 19.)

Reportedly, Plaintiff's health worsened, and he informed the facility's staff, through an inmate request slip sent on June 23, 2014, that he "was dry heaving[] and[] about to die." (*Id.* at 20.) Plaintiff avers that he "collapsed[] and[] began choking[]

and[] convulsing[] from . . . dehydration" and "was denied medical treatment for [twelve] hours." (*Id.*)  Also on June 23, 2014, according to the operative complaint, Nelson Torres, a medical doctor at the correctional facility, informed Plaintiff that Eslinger and Shaw had been told that isolation posed a substantial risk to Plaintiff's health.  (*Id.*)  Nonetheless, Plaintiff reports, on June 24, 2014, Shaw ordered Plaintiff returned to the isolation units.  (*Id.*)  Plaintiff avers that "[f]or [s]everal weeks after June 24, 2014, [Plaintiff] was denied all mail . . . , haircuts, showers, and[] recreation" and "continued to suffer extreme pain, sleeplessness, delirium, dissociation, and[] confusional psychosis." (*Id.* at 20–21.)  Allegedly, although in late August 2014 the correctional facility "adopted a policy of dimming the lights" in the isolation units for three to four hours each day, Plaintiff's health did not improve.  (*Id.* at 21.)

Plaintiff states that he "was released from the [isolation] conditions to B-Pod on November 30, 2014," and "remained in B-Pod until December 23, 2014, when [he] left" the correctional facility.  (*Id.*)  In Plaintiff's words, "[a]s a result of the [isolation] conditions which [he] experienced, [he] suffered a severe brain injury that left [him] insane until 2017." (*Id.*)  Plaintiff asserts that although his major symptoms started to abate in 2017, he "continued to suffer anxiety, depression, insomnia, nightmares, personality changes, memory loss, speech difficulties, serious emotional distress, and[] physical disability." (*Id.*)  Plaintiff reportedly "continue[s] to suffer [post-traumatic stress disorder] caused by the [isolation] conditions, as well as some sleep, memory, and[] speech[] problems" and "serious emotional distress." (*Id.*)

Plaintiff presently pursues nine counts against Defendants: six constitutional

violations through 42 U.S.C. § 1983 (counts one through six) and three torts under state law (counts nine, ten, and twelve).  (Dkt. 250 at 24–27; *see* Dkts. 276, 620, 679 (dismissing other claims from the operative complaint).)  Plaintiff brings each of the nine counts against all Defendants, except for count twelve, which he brings against Lemma.  (*See* Dkt. 250 at 24–27.)  For the constitutional violations, Plaintiff alleges unconstitutional conditions of confinement (count one), deliberate indifference to serious medical needs (count two), cruel and unusual punishment in the form of humiliation by video camera (count three), unreasonable search by video camera (count four), conditions creating a denial of due process in *United States v. White*, case no: 6:13-cr-304-JA-GJK (count five), and First Amendment retaliation (count six).  (*Id.* at 24–26.)  For the torts, Plaintiff alleges intentional infliction of emotional distress (IIED) (count nine), battery (count ten), and psychological malpractice (count twelve).  (*Id.* at  26–27.)  In response to Plaintiff's claims, Defendants (other than Klinger) advance a counterclaim for incarceration costs under sections 960.291, 960.293, and 960.297 of the Florida Statutes.  (Dkt. 251 at 11–12.)

### B.  Additional Facts

On May 13, 2014, Plaintiff was transferred by the USMS to the correctional facility and in turn to the custody of the Seminole County Sheriff's Office (SCSO), in charge of the facility, because Plaintiff faced federal criminal charges in *United States v. White*, case no: 6:13-cr-304-JA-GJK, for which he was convicted and sentenced.[1]

---

[1] The Eleventh Circuit opinion affirming Plaintiff's convictions and sentences in the case states that Plaintiff "sent emails and posted messages online threatening to kidnap, rape, and murder Florida

(Dkt. 635 at 2.)  Also on May 13, 2014, the USMS provided the SCSO with a report indicating that Plaintiff was a sovereign citizen, a white supremacist, and a neo-Nazi gang leader.  (*Id.*; *see* Dkt. 630-22.)  Plaintiff holds white nationalist beliefs and was involved in the American neo-Nazi movement from 2005 to 2008.  (Dkt. 635 at 1, 3.)

The correctional facility has three segregated housing units designated isolation (ISO): ISO-1, ISO-2, and ISO-3.  (*Id.* at 2.)  ISO-1 has three parts, and "cells ISO-1 to ISO-104 form one distinct part."  (*Id.*)  ISO-104 is "a bare cell with an elevated area made of cinder blocks" and has "a toilet, camera, light[,] and an opening in the floor."  (*Id.*)  ISO-202 is "the same but larger, with two lights, and no opening in the floor."  (*Id.*)  A hallway passes through ISO-2.  (*Id.*)  B-Pod "was an alternate segregation area in the [facility] used for disciplinary, administrative detention . . . and protective custody . . . cases."  (*Id.*)

On May 20, 2014, around 10:00 P.M., Plaintiff was transferred to the ISO-104 cell.  (*Id.*)  The same day, Klinger, a sergeant at the facility, signed a form reflecting that Plaintiff had been placed on administrative lockdown in light of the information received from the USMS.  (Dkt. 648-10.)  Klinger wrote that according to the USMS, Plaintiff raised security concerns, had gang and sovereign citizen affiliations, and "[wa]s a white supremacist" and "the leader of a neo-[N]azi group."  (*Id.*)  Klinger

---

state officials . . . and their spouses, children, and grandchildren[ ]with the intent to extort the[] officials into dismissing state charges against members of a white supremacist organization known as the American Front." *United States v. White*, 654 F. App'x 956, 958 (11th Cir. 2016). (*See* Dkt. 648 at 34.)  Plaintiff was convicted on five counts and sentenced to 210 months' incarceration. *White*, 654 F. App'x at 958–59. (*See* Dkt. 648 at 32–33.)

later testified that the decision to place Plaintiff in isolation was "[f]or the safety and security of the facility," including the inmates, and was based on the information from the USMS. (Dkt. 652 at 164.) Klinger testified to relying on that information. (*Id.* at 182, 187.)

Shaw, who was a captain at the facility, also testified that Plaintiff was placed in the isolation unit on May 20, 2014, based on the information from the USMS. (Dkt. 651 at 121.) According to Shaw, Plaintiff was placed in the isolation unit, which included continuous lighting and video monitoring, for safety and security reasons. (*Id.* at 130–32.) Shaw stated that the isolation units had continuous lighting and video monitoring for safety and security and that the video monitors were not "displayed to the public." (*Id.* at 56–58.) Shaw further testified that inmates in the isolation units were allowed visitation, recreation, use of a telephone, and books. (*Id.* at 61–62, 87.)

Plaintiff testified that he was moved to ISO-104 on May 20, 2014, and "immediately began requesting request slips and grievances on the issue." (Dkt. 648 at 153.) Plaintiff indicated that while assigned to ISO-104, he was regularly permitted outside for recreation, was given daily medications, and was allowed to make telephone calls. (*Id.* at 153–56.) Plaintiff also testified that he had regular meetings with his attorney. (*Id.* at 168–71.) Plaintiff denied formulating a plan or strategy to move out of ISO-104 apart from filing grievances. (*Id.* at 173.) Plaintiff further testified to his belief that the United States Attorney's Office, the Federal Bureau of Investigation (FBI), and the SCSO fabricated the charges against him. (*Id.* at 173–74.)

An audio recording of a telephone call was played during Plaintiff's deposition.

(*Id.* at 187–91.)  The recording and deposition indicate that on June 16, 2014, Plaintiff telephoned a female friend and informed her: "You know, this week hopefully we[ will] get some—and we[ will] lawsuit out.  Maybe that will have an impact.  After that I do[ not] have a lot of choices except to kind of disciplinary myself out of here.  So, where to next strategy."  (*Id.*)  Plaintiff explained that he was attempting to force a transfer out of the facility because he "was in incredible pain" and "was desperate."  (*Id.* at 191–92.)

On June 18, 2014, log reports reflected, and Plaintiff acknowledged, that he uttered profanities at correctional officers, started screaming, refused to move away from the food trap, threw wet toilet paper at the camera, and destroyed the shared portable telephone and everything in his cell.  (*Id.* at 177–83.)  After these incidents, Plaintiff testified, he was moved to ISO-201.  (*Id.* at 184.)

Plaintiff also testified that he stopped eating and drinking as of June 17, 2014.  (*Id.* at 193.)  Nurse Fuentes-Rivera testified to having an encounter with Plaintiff on June 19, 2014, and referring him to the mental health department and the doctor.  (Dkt. 656 at 76.)  According to Nurse Fuentes-Rivera, Plaintiff had missed three consecutive meals but stated that he would eat and drink if moved to another unit.  (*Id.* at 76–78.)  Nurse Fuentes-Rivera communicated to the mental health department and the doctor that his primary concern respecting Plaintiff was "to get [Plaintiff] back to eating and drinking to . . . regain optimal health."  (*Id.* at 98.)

Michael Todd, who was a mental health specialist at the facility, testified to having an encounter with Plaintiff on July 20, 2014, and conducting a mental health

evaluation on him. (Dkt. 653 at 98.) Todd met with Plaintiff due to the hunger strike and performed an assessment to determine whether Plaintiff was a danger to himself or others. (*Id.* at 100–01.) During the mental health evaluation, Todd described Plaintiff as "alert" and noted that Plaintiff was able to speak to him logically and coherently. (*See id.* at 112.) Todd testified that Plaintiff told him that Plaintiff wanted to be moved to B-Pod so that Plaintiff could avoid being "under a camera and . . . lights." (*Id.* at 113.) Todd further testified that Plaintiff "did not present as psychotic." (*Id.* at 117.) According to Todd, Plaintiff was not referred to the facility's psychiatrist because Plaintiff was not "exhibiting any signs or symptoms of any kind of psychosis," was denying any mental illness, and was refusing to eat for the purpose of being moved within the facility. (*Id.* at 121.)

Dr. Torres testified that on June 23, 2014, around 2:00 A.M., Plaintiff left a note on the door of Plaintiff's cell indicating that Plaintiff was dry heaving, and soon thereafter, Plaintiff was taken to the facility's medical unit. (Dkt. 655 at 162–63.) Records indicate that Dr. Torres met with Plaintiff on June 23, 2014, around 2:00 P.M. (*See id.* at 176–78.) Plaintiff testified that he was moved to the facility's medical unit around 2:30 P.M. and that while in the medical unit, he began eating and drinking. (Dkt. 648 at 196–97, 201–02.) Dr. Torres explained that Plaintiff was admitted to the facility's infirmary so that the medical staff could "offer food" to Plaintiff and "do blood work" on him. (Dkt. 655 at 187–88.)

Plaintiff testified that he was moved from the medical unit back to a cell in the isolation units on June 24, 2014, around 12:30 P.M. (Dkt. 648 at 202.) Dr. Torres

testified that the results of laboratory tests conducted on Plaintiff reflected that Plaintiff's "kidneys were fine," his creatinine and blood protein levels were "normal," his "liver function was perfect," and his "liver enzymes . . . were normal." (Dkt. 655 at 202–10.) Shaw testified that he deferred to medical and mental health professionals in returning Plaintiff to cell ISO-202 after his stay in the medical unit. (Dkt. 651 at 214.)

Plaintiff testified that following his return to the isolation units on June 24, 2014, he had very few complaints, received regular showers, went to recreation, visited with his attorney, and used the telephone during the rest of his stay at the facility. (Dkt. 648 at 203–04.) Plaintiff acknowledged that he did not make complaints or requests for medical or mental health services in the remaining months that he was at the facility. (*Id.* at 206.) Plaintiff also acknowledged that his housing status was reviewed periodically by staff at the facility. (*Id.*)

Plaintiff was sentenced on November 21, 2014, and about a week later was moved to B-Pod pending his transfer out of the facility. (Dkt. 635 at 3.) Plaintiff was transferred out of the facility on December 23, 2014. (*Id.*)

## APPLICABLE STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . ,

admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable [factfinder] could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that no evidence supports the non-moving party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a

genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). To assert qualified immunity, "a government official must have been acting within the scope of his 'discretionary authority' when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). "After a government official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff . . . ." *Id*. To avoid the application of qualified immunity, a plaintiff "must establish that a reasonable jury could find that [the officers] violated [the plaintiff's] constitutional

- 12 -

right, and that [t]his right was 'clearly established' when [the officers] violated it." *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)).  The court views the facts in the light most favorable to the plaintiff.  *See id*.  "If, at the summary judgment stage, the evidence construed in the light most favorable to the plaintiff shows that there are facts inconsistent with granting qualified immunity, then the case and the qualified immunity defense proceed to trial."  *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020).

Although the court "give[s] liberal construction" to pro se filings, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007), the leniency afforded to pro se plaintiffs "does not give [the] court license to serve as de facto counsel for [them] or to rewrite an otherwise deficient pleading . . . to sustain an action," *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) (emphasis and citations omitted), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Pro se plaintiffs are still "required . . . to conform to procedural rules."  *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002); *see Cummings v. Dep't of Corr.*, 757 F.3d 1228, 1234 n.10 (11th Cir. 2014) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law." (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981))).

## ANALYSIS

With respect to Plaintiff's claims, the court addresses, in order, the section 1983 claims against Eslinger, all claims against Lemma, counts one through six, and counts

- 13 -

nine and ten.  The court concludes with consideration of Defendants' counterclaim.

### A. Section 1983 Claims Against Eslinger

Eslinger is identified as a Defendant in counts one through six, which raise section 1983 claims for constitutional violations.  (Dkt. 250 at 24–26.)  Plaintiff has sued Eslinger in his individual capacity.  (*See id.*)

Eslinger was the Sheriff of Seminole County, Florida, in 2014.  (Dkt. 650 at 8.) He retired from the position in January 2017.  (*Id*. at 9.)  Eslinger testified at his deposition that he had no personal involvement in or knowledge of Plaintiff's incarceration during his time at the facility in 2014.  (*Id*. at 195–97.)  Eslinger also stated in an affidavit:

> I did not have any personal involvement in or knowledge of Plaintiff[]'s incarceration during his time at the [facility] in 2014.  I did not make any decisions relating to the housing of Plaintiff . . . at the [facility], nor did I direct [the facility's] staff take any specific actions . . . relate[d] to the housing of Plaintiff . . . in 2014.

(Dkt. 650-26 at 3.)

Eslinger testified that he delegated the authority to operate the correctional facility based on SCSO guidelines, the Model Jail Standards, and the recommendations of the three accrediting entities.  (Dkt. 650 at 26–27.)  The training of employees at the facility was based on state law, American Correctional Association standards, Florida Correction Accreditation standards, and Florida Model Jail Standards.  (*Id*. at 106.)  Eslinger ensured compliance with the standards by communicating with Major Diggs and the Professional Standards division of the SCSO.  (*Id*. at 106–07.)

Shaw, who oversaw operations at the facility in 2014, testified that he did not discuss an inmate's placement in the isolation units with Eslinger or Lemma and that he did not make Eslinger aware when an inmate needed medical or mental health care. (Dkt. 651 at 53, 77–78.)  He also testified that between May 20 and November 30, 2014, he did not communicate with either Eslinger or Lemma.  (*Id*. at 98–99.)  Shaw added that the USMS initiated Plaintiff's placement in isolation.  (*Id*. at 159.)

Klinger testified that in 2014 he was responsible for "intelligence and investigations into incidents at the facility."  (Dkt. 652 at 9.)  Klinger also testified that Eslinger was not involved in making policy for the facility, that Eslinger would not have been informed if an inmate had been placed in the isolation units or had stopped eating or drinking, and that Klinger did not communicate with Eslinger.  (*Id*. at 60, 86–87, 111, 136.)

Defendants contend that Eslinger is entitled to qualified immunity on the section 1983 claims because Eslinger "had absolutely no personal involvement in the circumstances surrounding [Plaintiff]'s incarceration" at the facility in 2014.  (Dkt. 645 at 39 n.21.)  Plaintiff counters by pointing to his June 17, 2014 affidavit, in which Plaintiff stated that Shaw "identified himself as the person responsible" for the complained-of housing conditions and claimed to be "acting on behalf of" Eslinger. (Dkt. 630-26 at 3; Dkt. 684 at 8.)  Plaintiff also asserts that emails sent by Plaintiff's mother to Eslinger and Shaw's response to those emails reflect Eslinger's involvement and that Shaw's deposition testimony indicates that he had been forwarded emails from Plaintiff's mother to Eslinger.  (Dkt. 630-25 at 2; Dkt. 630-32 at 2; Dkt. 630-45 at

38; Dkt. 684 at 8.)  The court agrees with Defendants.

Proof of a causal link between a particular defendant's actions and the alleged constitutional deprivation is required for a section 1983 claim.  *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993).  Section 1983 claims may not be brought against supervisory officials solely based on vicarious liability or respondeat superior.  *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).  Supervisors can be held liable under section 1983 if they personally participated in the alleged constitutional violation or a causal connection existed between their actions and the alleged violation.  *Id*.  Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  In determining whether a genuine dispute of material fact exists to defeat a motion for summary judgment, the court views the evidence in the light most favorable to the party opposing summary judgment and draws all justifiable inferences in the opposing party's favor.  *Anderson*, 477 U.S. at 255.

Plaintiff has not provided evidence showing Eslinger's personal participation in the alleged violations or a causal connection between Eslinger's actions and the alleged violations.  The emails identified by Plaintiff do not establish that Eslinger personally participated in the alleged constitutional violations.  In fact, Shaw testified to receiving emails directed to the Office of the Sheriff.  (Dkt. 651 at 146.)  According to Shaw, those emails were forwarded to him by Eslinger's secretary or one of Eslinger's chiefs or majors.  (*Id.*)  Shaw testified that he did not receive the emails directly from Eslinger.

- 16 -

(*Id.* at 146–47.)    Further, Plaintiff's affidavits lack sufficient specifics regarding Eslinger's actions to overcome summary judgment.  (*See, e.g.,* Dkt. 630-26 at 3; Dkt. 630-65 at 13.)  As a result, Plaintiff has failed to demonstrate that a genuine issue of material fact remains regarding Eslinger's liability for any alleged constitutional violations.  *See Poole v. Streiff*, No. 07-0749-KD-C, 2008 WL 2699420, at *5, 2008 U.S. Dist. LEXIS 125502, at *16 (S.D. Ala. May 29, 2008) ("Because [the p]laintiff has failed to present any evidence that would establish a causal connection between any actions, omissions, or policies of [the defendant police chief] and the alleged constitutional violations in this case, [the] claim against [the police chief] fails as a matter of law."), *report and recommendation adopted by* 2008 WL 2699420, at *1, 2008 U.S. Dist. LEXIS 49755, at *1 (S.D. Ala. June 30, 2008).  Accordingly, Eslinger is entitled to summary judgment on the section 1983 claims against him in counts one through six.[2]

## B. All Claims Against Lemma

Lemma is identified as a Defendant in counts one through six and count twelve. (Dkt. 250 at 24–27.)    Counts one through six advance section 1983 claims for constitutional violations, and count twelve alleges psychological malpractice.  (*Id.*)

---

[2] Plaintiff also argues that Eslinger is liable for the section 1983 claims under a theory of deliberate ignorance. (Dkt. 630 at 20.)  However, Plaintiff has failed to establish that deliberate ignorance is a basis for liability with respect to the section 1983 claims against Eslinger.  The (predominantly criminal) cases cited by Plaintiff, (*see id.* at 14), are distinguishable because they do not concern section 1983. *See, e.g.*, *United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023).  The court notes that Plaintiff must develop his own arguments and cannot depend on the court to develop them.  *See Glob. Marine Expl., Inc. v. Republic of France*, 151 F.4th 1296, 1309–10 (11th Cir. 2025) ("Under th[e] principle [of party presentation], [courts] rely on parties to litigation to frame the issues for decision and retain the role of neutral arbiter of matters [that] the parties present." (quotation omitted)).

Lemma is the current Sheriff of Seminole County, Florida, and Plaintiff has sued him in his official capacity.  (*Id.* at 13, 24–27.)

Plaintiff claims that Shaw's status as "the final policymaker" regarding "placing and maintaining prisoners" in isolation "establishes Lemma's official[-]capacity liability." (Dkt. 630 at 20.)  Plaintiff also claims that Shaw's testimony that Shaw "had final, unreviewable, power to say [what] was or was not torture[ ]in the [isolation] units[,] and for how long[,] . . . alone establishes municipal liability." (Dkt. 684 at 32–33.)  Additionally, Plaintiff argues that the SCSO policies and procedures dealing with inmate classification and segregation for the facility, (*see* Dkts. 630-6, 630-7), represent "the relevant policy statements governing the decision whether or not to place a prisoner" in isolation, (Dkt. 684 at 8).  For their part, Defendants contend that Plaintiff "has failed to provide evidence of an underlying constitutional violation, or of a policy, practice[,] or custom that led to any alleged constitutional violation." (Dkt. 666 at 16.)

A county official, like Lemma, may be held liable in his official capacity if a constitutional violation resulted from either "an action taken or policy made" by a final policymaker for the county in the "area of [its] business" at issue or "a practice or custom that is so pervasive[] as to be the functional equivalent of a policy adopted by the final policymaker." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 694 (1978) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," and that a local government may be liable under section 1983 "when execution of [its] policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury"). "A policy is a decision that is officially adopted by the [governmental entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [governmental entity]" while "[a] custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" on a governmental entity as part of either a policy or a custom unless the challenged policy itself is unconstitutional. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

In response to Defendants' motion, Plaintiff has failed to establish a genuine dispute of material fact to preclude summary judgment for Defendants regarding whether Lemma implemented an unconstitutional policy or custom. Specifically, Plaintiff has not presented evidence of an unconstitutional policy or custom and has not pointed to any other incidents involving the alleged constitutional violations besides his own experience in the correctional facility in 2014. Plaintiff has not established that Lemma was on notice of a history of abuses at the facility like those alleged by Plaintiff or that Lemma had set forth customs or policies resulting in deliberate indifference to constitutional rights. *See West v. Tillman*, 496 F.3d 1321, 1328–29 (11th Cir. 2007). Fundamentally, Plaintiff has not shown that Lemma adopted a custom or policy that resulted in the alleged constitutional violations. As a result, Lemma is entitled to summary judgment on Plaintiff's section 1983 claims in counts one through six. *See Seaman v. Fleurjean*, No. 8:23-cv-1060-WFJ-NHA, 2025

WL 1918892, at *17, 2025 U.S. Dist. LEXIS 131707, at *51 (M.D. Fla. July 11, 2025) (granting summary judgment to a sheriff on official-capacity section 1983 claims and explaining that "[t]he Supreme Court severely restricts municipality liability under [s]ection 1983" such that "[f]or a municipality to be held liable, it must be directly responsible for the unconstitutional acts").[3]

The remaining claim against Lemma, in count twelve, alleges that he committed psychological malpractice by "fail[ing] to maintain accurate medical records" and by not "properly diagnos[ing] and treat[ing Plaintiff's] serious medical needs." (Dkt. 250 at 27.)  Plaintiff asserts that mental health professionals at the correctional facility including Todd "falsified mental health records," and because Todd had a professional license and "was performing his duties for the SCSO, Lemma is liable." (Dkt. 684 at 36.)

Defendants maintain:

> The Florida medical malpractice statute is applicable to claims "arising out of the rendering of, or the failure to render, medical care or services." Fla. Stat. § 766.106(1)(a).  This statute requires that a plaintiff, before filing a complaint for medical negligence, provide notice to each prospective defendant of the intent to file suit, by certified mail. Fla. Stat. § 766.106(2)(a).

(Dkt. 645 at 49.)  In Defendants' view, Plaintiff's psychological malpractice claim against Lemma fails because Plaintiff did not comply with the statutory pre-suit notice requirement, as Plaintiff did not provide the necessary notice to anyone. (*Id.*)  Plaintiff

---

[3] To the extent that Plaintiff has sued any other Defendants in their official capacities, they are entitled to summary judgment on the official-capacity claims for the same reasons.

does not dispute that he failed to provide pre-suit notice, but he submits that the requirement is "a procedural rule not applicable to the federal courts under the *Erie*[4] doctrine." (Dkt. 684 at 35.)

"Federal courts typically consider pre-suit notice requirements to be substantive laws, rather than procedural laws, for *Erie* analysis." *Curry v. High Springs Fam. Prac. Clinic & Diagnosis Ctr., Inc.*, No. 1:08-cv-00008-MP-AK, 2008 WL 5157683, at *9, 2008 U.S. Dist. LEXIS 99462, at *28 (N.D. Fla. Dec. 9, 2008); *accord Danhi v. Charlotte Cnty. Sheriff's Dep't*, No. 2:03-cv-628-FtM-99DNF, 2006 WL 2226323, at *7, 2006 U.S. Dist. LEXIS 53676, at *19–20 (M.D. Fla. Aug. 3, 2006) ("Florida['s] [m]edical [m]alpractice [s]tatutes are substantive in nature." (citing *Woods v. Holy Cross Hosp.*, 591 F.2d 1164 (5th Cir. 1979), and *Clark v. Sarasota Cnty. Pub. Hosp. Bd.*, 65 F. Supp. 2d 1308 (M.D. Fla. 1998))). The psychological malpractice claim against Lemma is a claim of medical malpractice, *see Cagle v. United States*, 738 F. App'x 633, 639 (11th Cir. 2018) ("Because the allegations . . . rely on the application of medical skill and judgment in making a diagnosis and recommending treatment, those allegations arise from the rendering of medical services and are therefore medical[ ]malpractice claims under Florida law."), and Florida law requires a plaintiff to "provide pre-suit notice to defendants in medical malpractice actions," *Ireland v. Prummell*, 53 F.4th 1274, 1302 (11th Cir. 2022) (citing Fla. Stat. § 766.106(2)). Because Plaintiff failed to provide pre-

---

[4] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (generally requiring federal courts sitting in diversity to apply the law of the forum state to substantive issues but federal law to procedural issues).

suit notice, Lemma is entitled to summary judgment on count twelve.  *See id.* at 1303; *see also Johnson v. McNeil*, 278 F. App'x 866, 872 (11th Cir. 2008) (affirming the dismissal of a wrongful death claim based on medical malpractice because "Florida law mandates the dismissal of a claim for medical malpractice when the pre-suit requirements have not been fulfilled").[5]

## C. Count One

Count one alleges a section 1983 claim based on a violation of Plaintiff's rights under the Eighth Amendment because Defendants allegedly willfully and wantonly placed and maintained Plaintiff in isolation "with the intent to cause [him] extreme pain, physical injury, [or] serious emotional distress."  (Dkt. 250 at 24.)  Plaintiff asserts that Shaw and Klinger violated his Eighth Amendment rights by placing him "in a room with a light as bright as a car's high beams shining on [him twenty-four ]hours a day,"[6] which caused him "to suffer extreme sleep deprivation" and "left [him] in extreme pain."  (Dkt. 630 at 19–20.)  According to Plaintiff, Defendants "maintained [him] in the conditions without any . . . legitimate penological reason."  (*Id.* at 20.)  Defendants argue that subjecting Plaintiff to continuous lighting "did not amount to an Eighth Amendment violation" and that in any event, they are entitled

---

[5] Further, under Florida law, "[t]he elements of a medical malpractice action are[] (1) a duty by the physician, (2) a breach of that duty, and (3) causation."  *Saunders v. Dickens*, 151 So.3d 434, 441 (Fla. 2014).  Plaintiff has not put forward evidence showing a genuine dispute of material fact as to these elements, and Lemma is entitled to summary judgment on that basis as well.

[6] To clarify, Plaintiff claims that he was exposed to bright lighting in the ISO units twenty-fours a day from May 20 to July 28, 2014, at which point the facility turned off the lights from 12:00 AM to 4:00 AM each night. (Dkt. 630-65 at 4.)

to qualified immunity.  (Dkt. 645 at 34; *see* Dkt. 666 at 15–17.)

To the extent that Plaintiff was a pretrial detainee, a pretrial detainee's "rights exist under the [D]ue [P]rocess [C]lause of the Fourteenth Amendment rather than the Eighth Amendment." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (citation omitted); *accord Williams v. S. Fulton Reg'l Jail*, 152 F. App'x 862, 863 n.2 (11th Cir. 2005) ("[C]laims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause . . . ." (quotation omitted)).  However, to establish a claim under either the Eighth or Fourteenth Amendment, a "plaintiff[] must prove three elements": (1) "a condition of confinement that inflicted unnecessary pain or suffering," (2) "the defendants' deliberate indifference to that condition," and (3) "causation." *LaMarca*, 995 F.2d at 1535 (quotation omitted); *see White v. Cochran*, No. 16-17490-G, 2017 WL 6492004, at *3, 2017 U.S. App. LEXIS 26588, at *6 (11th Cir. Nov. 27, 2017) (applying this standard in the pretrial detainee context).

Whether a particular condition of confinement constituted cruel and unusual punishment is an objective inquiry, and whether prison officials were deliberately indifferent to that condition is a subjective inquiry.  *See LaMarca*, 995 F.2d at 1535 n.17 (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).  The objective component of the claim requires conditions "so serious as to deprive [inmates] of the minimal measure of life's necessities," as when an inmate is denied "some basic human need." *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (quotations omitted); *see Farmer v. Brennan*,

- 23 -

511 U.S. 825, 834 (1994). Regarding the subjective component, "only the unnecessary and wanton infliction of pain" violates the Constitution. *Farmer*, 511 U.S. at 834 (quotation omitted). Although conditions of confinement that constitute severe deprivations without penological justification may violate an inmate's rights, a correctional regulation that infringes on an inmate's rights will typically be upheld if reasonably related to legitimate penological interests. *See Rhodes v. Champan*, 452 U.S. 337, 347 (1981).

In this case, Shaw provided deposition testimony that he oversaw the facility's operations, including security and housing. (Dkt. 651 at 10.) Shaw testified that Plaintiff was placed in administrative lockdown in the isolation units on May 20, 2014, and Shaw attributed the basis for the placement to the USMS, which had provided a report indicating that Plaintiff had gang and sovereign citizen affiliations and was a white supremacist and the leader of a neo-Nazi organization. (*Id.* at 120–21; *see* Dkt. 630-22.) Additionally, Shaw stated in an affidavit that upon review of the report from the USMS, "Klinger in the intelligence unit then placed [Plaintiff] on administrative lockdown pursuant to the [report], which occurred on May 20, 2014, within a week from [Plaintiff]'s intake." (Dkt. 667 at 2.) Shaw testified that the USMS specifically requested that Plaintiff be housed in the isolation units. (Dkt. 651 at 159.)

Shaw explained that inmates would be placed in B-Pod "for those infractions that happened inside the . . . facility, . . . primarily disciplinary infractions," whereas inmates who "needed more attention" would be placed in the isolation units. (*Id.* at 58.) For example, Shaw testified, isolation was imposed to ensure that inmates did

not hurt themselves or others or to address concerns that an inmate was an escape risk or was extremely violent or high-profile. (*Id.*) According to Shaw, when appropriate, inmates would be placed in the isolation units, as opposed to B-Pod, because the isolation units had "camera access, . . . visibility, and . . . mandated watches." (*Id.* at 59–60.) Shaw stated that the isolation units had continuous bright lighting and video monitoring, as well as less access to other inmates. (*Id.* at 61.) In addition, Shaw explained why Plaintiff in particular was housed in the isolation units and not in B-Pod:

> B-[P]od was definitely an option. But B-[P]od[ is] double, triple, [or] quadruple the number of inmates. And [it is] access other inmates would have to you. . . . They can throw stuff. They can, which they have when they[ have] been out, throw feces or urine or something on the inside of other cells. The door[ is] not secure. They[ have] been since fixed, but we had to latch them on the outside at one time because they[ are] able to actually manipulate the locks and open the doors. Just not a secure environment—as a secure environment.

(*Id.* at 140–41.)

Shaw did not recall whether the lights in the ISO-101 to 104 and ISO-2 cells were on twenty-four hours a day, and he was unsure of the type of bulbs used in the lights. (*Id.* at 26–27.) When asked whether he agreed that no one should be subjected to continuous bright lighting, Shaw generally agreed but made an exception for purposes of safety and security. (*Id.* at 28.) According to Shaw, the continuous bright lighting was necessary for safety and security in that officials needed the light to watch the inmates. (*Id.* at 56.) Shaw acknowledged receiving an email from Plaintiff's mother in which she informed Shaw that Plaintiff was upset about, among several

other matters, "a bright light constantly on in his cell." (*Id.* at 208–09; *see* Dkt. 630-28 at 2.) Further, Shaw responded to the question "If you wanted to protect yourself, why did[ you not] transfer [Plaintiff] out of the [ISO] unit[s]?" by testifying: "My concern was protecting [Plaintiff]. And I[ have] said it over and over again. If it was up to me, [Plaintiff] would have been in population." (Dkt. 651 at 218.)

With regard to Klinger, deposition testimony supports that as a corporal or sergeant at the correctional facility in 2014, Klinger held duties consisting of "intelligence and investigations into incidents at the facility." (Dkt. 652 at 9.) Klinger testified to being unaware that the lights in the isolation units were left on for twenty-four hours each day. (*Id.* at 41.) Klinger further testified that he did not decide whether inmates would be subjected to continuous lighting, that he did not know why inmates in the isolation units were subjected to continuous lighting, (*id.* at 93), and that he was not responsible for the operation of the lights at the facility, (*id.* at 34).

Klinger explained that the decision on whether an inmate would be placed in the isolation units or in B-Pod "ha[d] to do with the safety and security of the inmate as well as the facility and the classifications" of the inmate. (*Id.* at 95.) Regarding Plaintiff specifically, Klinger testified that Plaintiff was placed in the isolation units based on the report from the USMS, which identified the security concerns for Plaintiff related to his gang and sovereign citizen affiliations, white supremacist beliefs, and neo-Nazi leadership role. (*Id.* at 161.) According to Klinger, Plaintiff was placed in the isolation units "[f]or the safety and security of the facility, as well as the inmates," based on the report from the USMS. (*Id.* at 164.)

- 26 -

Plaintiff testified at his deposition about the allegedly unconstitutional lighting in the isolation units: "[T]he lights in there were extremely bright.  They were on [twenty-four] hours a day.  It is impossible to distinguish day from night when you [are] in those cells." (Dkt. 648 at 155.)  Plaintiff also stated in his affidavit: "Each light in the [isolation] cells was . . . about as strong at least as a single . . . high beam head[]light." (Dkt. 630-65 at 4.)  Plaintiff's affidavit supports that on June 6, 2014, he discussed the continuous lighting with Shaw. (*Id*. at 13.)  Additionally, Plaintiff stated in his affidavit that on May 29, 2014, he told Klinger to "turn the lights off in the ISO-104 cell," and that on June 18, 2014, he informed Klinger that the isolation conditions were "causing [him] pain and [were] responsible for [his] conduct." (*Id*. at 14, 21.) Plaintiff acknowledges that after July 28, 2014, the lights were shut off for four hours at night. (Dkt. 681 at 3.)  As to the ill effects allegedly attributable to the lighting, Plaintiff has submitted an expert report opining that he suffered "sleep deprivation due to the high-intensity lighting to which he was exposed" and that he "appears to have developed post[-]traumatic stress disorder after the sleep deprivation experience, in concert with . . . other reported incidents." (Dkt. 630-49 at 21 (emphasis omitted).)

Because sleep is generally considered "one of life's basic needs," carceral "[c]onditions designed to prevent sleep" may be unconstitutional. *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999); *accord Bracewell v. Lobmiller*, 938 F. Supp. 1571, 1579 (M.D. Ala. 1996) (holding, without the mention of qualified immunity, that the "sleep deprivation and anxiety which [a mentally disturbed inmate's] behavior cause[d] certainly result[ed] in a deprivation of basic necessities which r[ose] to the level of a

constitutional violation" for another inmate in the unit).  That said, any constitutional violation notwithstanding, Defendants assert their entitlement to qualified immunity based on Plaintiff's "fail[ure] to present sufficient facts to support a claim for violation of a clearly established constitutional right by Defendants."  (Dkt. 645 at 39.)  Because Defendants were acting within the scope of their discretionary authority when the alleged misconduct occurred, Plaintiff must show that Defendants violated clearly established constitutional rights.  *See Nelson*, 89 F.4th at 1296.

At a general level, a condition of an inmate's confinement such as constant illumination may violate an inmate's constitutional rights if the lighting denies the inmate "the minimal civilized measure of life's necessities," *Rhodes*, 452 U.S. at 347, as through sleep deprivation, and is the result of deliberate indifference by officials, *Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991).  However, "'clearly established law' should not be defined 'at a high level of generality'" for the qualified immunity analysis.  *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *accord Gaines v. Wardynski*, 871 F.3d 1203, 1207 (11th Cir. 2017). Plaintiff has not shown that the United States Supreme Court, the Florida Supreme Court, or the Eleventh Circuit "has held that the specific actions or omissions allegedly undertaken by" Defendants "that resulted in Plaintiff's sleep deprivation violated clearly established law." *See Cruz v. Green*, 352 F. Supp. 3d 1213, 1224 (S.D. Fla. 2019); *see also Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("look[ing] only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine

whether the right in question was clearly established at the time of the violation"). Nor has Plaintiff established that his case presents a rare situation in which the obvious clarity doctrine applies such that binding precedent is unnecessary. *See Hughes v. Locure*, 166 F.4th 121 (11th Cir. 2026) ("In light of the rarity of obvious clarity cases, if a plaintiff cannot show that the law at issue was clearly established [by pointing to a materially similar decision of the United States Supreme Court, of the Eleventh Circuit, or of the supreme court of the state in which the case arose], that [failure] usually means [that] qualified immunity is appropriate." (quotations omitted)).

Indeed, persuasive caselaw supports that the complained-of lighting was not a violation of rights clearly established in the law. *See White v. Berger*, 709 F. App'x 532, 540 (11th Cir. 2017) ("[M]ere construction of the isolation units is insufficient to support a claim of municipal liability. Legitimate law enforcement functions support virtually all of the cells' features. The presence of a camera in the cells and the need for constant lighting, for example, can be important for the prison to monitor particularly dangerous inmates at all hours." (citing *Bass v. Perrin*, 170 F.3d 1312, 1317 (11th Cir. 1999))); *see also Chappell v. Mandeville*, 706 F.3d 1052, 1057–60 (9th Cir. 2013) (reversing the denial of summary judgment as to continuous lighting claims on the ground that the defendant prison officials were entitled to qualified immunity because the unconstitutionality of the officials' conduct was not clearly established in the law); *Chavarria v. Stacks*, 102 F. App'x 433, 437 (5th Cir. 2004) ("[T]he policy of [twenty-four]-hour illumination does not violate the Eighth Amendment[.]").

In light of the above, Defendants are entitled to qualified immunity as to count

one.  Therefore, the court grants them summary judgment on that count.

## D. Count Two

Count two alleges a section 1983 claim based on deliberate indifference to Plaintiff's serious medical needs.  (Dkt. 250 at 24.)  Specifically, Plaintiff asserts that Klinger and Shaw were deliberately indifferent to Plaintiff's serious medical and psychological needs by placing and maintaining him in the isolation units while knowing that doing so was "causing [him] objectively serious medical conditions." (*Id.*)  Plaintiff argues in his motion for summary judgment that Klinger and Shaw knew that isolation was "rendering prisoners incompetent" and were on "notice long before" isolation "caused [him] to have a psychotic break that [he] was on that path."  (Dkt. 630 at   20–21.)    Plaintiff further maintains that neither Klinger nor Shaw "communicated with the medical [unit] or mental health [department] and provided basic information, like [the fact] that [he] was suffering sleep deprivation or the correct number of days [that he had] been without food or water."  (*Id.* at  21.)

Defendants contend that Shaw and Klinger are undisputedly not health providers, that they accordingly deferred to health providers regarding health issues, and that not only testimony from Shaw and Klinger but also medical records from the correctional facility support their practice of deferring to health providers.  (Dkt. 666 at 17.)  Defendants add that Plaintiff "has failed to provide evidence that [they] were deliberately indifferent to a serious medical need," and they assert their entitlement to qualified immunity.  (*Id.*)

Defendants have attached Plaintiff's medical records from the facility, which

- 30 -

contain record entries from the period of May 13 to November 30, 2014. (Dkt. 648-15.) According to the records, when Plaintiff entered the facility, the medical staff performed a medical intake screening, and Plaintiff denied having any medical or mental health issues, illnesses, or problems. (*Id*. at 194–96). Plaintiff's "[b]ehavior and [s]tate of [c]onsciousness" were described as "[a]ppropriate." (*Id*. at 193.) On May 17, 2014, Plaintiff told the medical staff that he suffered from serious allergies leading to bronchitis, which the medical staff interpreted as chronic sinus problems and headaches, and the medical staff prescribed Plaintiff guaifenesin (a common brand of which is Robitussin) for his sinus congestion and ibuprofen for his headaches. (*Id*. at 187–88.)

On May 24, 2014, Plaintiff received a dental screening, and the medical staff performed a history and physical evaluation of him. (*Id*. at 172–78.) He was not found to have any current illnesses and denied having any psychiatric problems. (*Id*.) On May 25, 2014, Plaintiff denied any need for mental health treatment. (*Id*. at 170.) Dr. Torres noted on June 3, 2014, that there was a possibility that Plaintiff was suffering from a condition called allergic cough, so Dr. Torres prescribed Plaintiff the antihistamine loratadine (a common brand of which is Claritin). (*Id*. at 164–65.)

On June 19, 2014, the medical staff noted that Plaintiff was on a hunger strike, that he refused to eat or drink anything until a transfer to another cell, and that he had

refused three consecutive meals. (*Id.* at 150–52).[7] The medical staff assessed Plaintiff's vital measurements, and the nurse assured Plaintiff that her "number one concern [was] to get him back to eating and drinking to maintain optimal health." (*Id.* at 149 (emphasis omitted).) Plaintiff mentioned to the medical staff that his hunger strike would continue until he was "treated with respect," as he was "receiving inhumane treatment." (*Id.* (emphasis omitted).) He stated: "I will continue to refuse to eat or drink anything until I get moved out of this cell." (*Id.* at 150 (emphasis omitted).) Plaintiff further stated: "I understand if you want me to be in isolation, so move me to ISO[-]1." (*Id.* (emphasis omitted).) He complained that he could not "sleep with a camera on [him] and lights on" continuously. (*Id.*) Plaintiff stated that he would end the hunger strike if moved to ISO-1. (*Id.* at 150–51.) The medical staff noted that Plaintiff's vital signs did not indicate mental or physical exhaustion. (*Id.* at 150.) Plaintiff was referred to the mental health department. (*Id.* at 149–50.) The medical staff noted that Plaintiff was sent back to his cell and that he "walked without resistance and without problems." (*Id.* at 149 (emphasis omitted).)

Plaintiff underwent "Code Orange/Emergency Care" on June 21, 2014, complaining: "You people are not feeding me." (*Id.* at 143 (emphasis omitted).) The medical staff evaluated Plaintiff, found no medical issues, and encouraged Plaintiff to eat and to drink fluids. (*Id.* at 143–44.) On June 23, 2014, Plaintiff was admitted to

---

[7] Plaintiff alleges that he was transferred to ISO-2 on June 18, 2014, and that at the time of this transfer, he "had not eaten[] or[] drunk water[] since late . . . June 17, 2014," and "would not be able to eat[] or[] drink water[] for the next several days, until June 23, 2014." (Dkt. 250 at 18.)

the infirmary for observation in light of his hunger strike. (*Id.* at 136–42.) The medical staff advised Plaintiff to hydrate and explained to him the harmful effects of prolonged fasting. (*Id.* at 138.) The medical records indicate that Plaintiff had "lost plenty [of] weight" and that Plaintiff agreed to eat if he was moved from his cell. (*Id.* at 138–42 (emphasis omitted).) Plaintiff began eating on June 23, 2014, and was discharged from the infirmary on June 24, 2014. (*Id.* at 133–36.) Plaintiff's laboratory results were described as non-significant based on a lack of clinical correlation. (*Id.* at 134.)

When shown the medical records at his deposition, Plaintiff testified as follows: On May 15, 2014, he met with a nurse at the facility to obtain medication for allergies. (Dkt. 648 at 132–35; Dkt. 648-15 at 189.) On May 17, 18, 19, 22, and 23, 2014, the medical staff provided Plaintiff with ibuprofen and Robitussin. (Dkt. 648 at 135–38, 160–61; Dkt. 648-15 at 180–81, 184–85, 187–88.) On May 24, 2014, Plaintiff went to the clinic for a physical examination. (Dkt. 648 at 161; Dkt. 648-15 at 175.) Plaintiff denied having any illnesses at that time. (Dkt. 648 at 163; Dkt. 648-15 at 175–78.) Although the medical records indicate that a daily segregation assessment was performed on May 26, 2014, and that a mental health specialist at the facility met with Plaintiff on May 29, 2014, Plaintiff denied that those incidents occurred. (Dkt. 648 at 168–69; *see* Dkt. 266 at 2.) Plaintiff acknowledged that he received his medications through the week of June 8, 2014. (Dkt. 648 at 170–75.) On June 17, 2014, Plaintiff described being "in incredible, overwhelming pain," and he did not eat dinner on June 18, 2014, or any further meals until June 23, 2014. (*Id.* at 185–86, 194–96.) Plaintiff was transferred to the medical unit on June 23, 2014. (*Id.* at 196–97.)

Plaintiff testified that he stopped eating and drinking on June 17, 2014. (*Id.* at 193.) Plaintiff's affidavit corroborates this testimony inasmuch as it states that on June 19, 2014, Plaintiff met with Nurse Fuentes-Rivera to report that Plaintiff "could not eat or drink and asked to be transferred to B-Pod or population. [Plaintiff] did not say that [he] would not eat and did not ask to be transferred to D-Pod" or isolation. (Dkt. 630-65 at 15.) Plaintiff did not eat or drink anything until dinner on June 23, 2014, when he was taken to the medical unit.[8] (Dkt. 648 at 194–202.) Plaintiff was discharged from the medical unit on June 24, 2014. (*Id.* at 202.) Plaintiff stated that he did not refuse to eat or drink between June 17 and 23, 2014; instead, he "did not eat on those days. [He] did not drink water on those days. [He] thought [he] was going to die on those days." (*Id.* at 196.) Plaintiff indicated that he told Todd: "I [cannot] eat or drink." (*Id.* at 195.)

Nurse Fuentes-Rivera testified that when an inmate in the isolation units stopped eating or drinking, the situation would be labeled a hunger strike. (Dkt. 656 at 48.) Plaintiff's situation was so labeled because three meals in a row were refused, and the situation was referred to the medical staff. (*Id.*) Nurse Fuentes-Rivera entered "hunger strike" into the system and referred the matter to the mental health department. (*Id.* at 91, 99.) Dr. Torres would also have received the referral. (*Id.* at 100.)

---

[8] The Hunger Strike form prepared by the Inmate Health Care Services Division reflects that Plaintiff did not eat dinner on June 18, 2014, did not eat any meals from June 19 to 22, 2014, and ate dinner on June 23, 2014. (Dkt. 648-13 at 1–2.)

Shaw testified that he became aware that Plaintiff stopped eating and drinking a "couple of days into" the situation, and he deferred to Plaintiff's statement that Plaintiff stopped eating and drinking from June 17 to 23, 2014. (Dkt. 651 at 182.) Shaw understood Plaintiff's reason for not eating or drinking as "[b]eing segregated." (*Id*. at 183.) Reportedly, after Shaw learned that Plaintiff had stopped eating and drinking, Shaw deferred to the facility's medical and mental health staff with respect to following up and taking corrective actions for the situation. (*Id*. at 185–86.)

The Constitution prohibits deliberate indifference to the serious medical needs of incarcerated individuals. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eleventh Circuit has explained:

> "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). To meet the first prong, the plaintiff must demonstrate an "objectively serious medical need"—*i.e.*, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." *Id*. (alteration adopted) (quotations omitted). To satisfy the second, subjective prong, the plaintiff must prove that the prison officials "acted with deliberate indifference to [his serious medical] need." *Harper v. Lawrence County*, 592 F.3d 1227, 1234 (11th Cir. 2010) (quotation omitted).

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (alteration in original and case name in final citation modified). The second prong requires that the plaintiff "demonstrate that the defendant acted with subjective recklessness as used in the criminal law" by "show[ing] that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade*

*v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (quotation omitted). However, "even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable . . . if he responded reasonably to the risk." *Id.* (quotation omitted).

Inmates have the constitutional right to receive medical treatment for their illnesses and injuries. *See Estelle*, 429 U.S. at 104. Deliberate indifference to their serious medical needs is therefore a constitutional violation. *Id.* To establish deliberate indifference, Plaintiff must demonstrate "(1) a serious medical need[,] (2) [D]efendants' deliberate indifference to that need[,] and (3) causation between that indifference and [his] injury." *See Mann*, 588 F.3d at 1306–07.

Defendants argue:

[I]n fact, the electronic medical records regarding [Plaintiff] reflect that medical staff and mental health staff attended to him on a daily and weekly basis and essentially noted no health or mental health concerns apart from the approximate week-long period in June 2014 when [Plaintiff] went on a hunger strike and lost weight. And[] during that time period[,] the medical records reflect that [Plaintiff] was transferred to the medical unit where he was promptly attended to by medical staff, he ended his hunger strike, he began eating and drinking again, and [he] was ultimately returned back to his cell. [Plaintiff]'s claim for deliberate indifference must fail. *Mattingly v. Duval Cnty. Jail*, 777 F. App'x 971, 972 (11th Cir. 2019) (noting that the testimony and medical records, "far from establishing constitutional violations, showed [that the pro se plaintiff] received consistent and adequate medical evaluation and treatment" and that "[t]hat the defendants did not provide [the plaintiff] with his desired course of treatment, or comply with the recommendations of outside medical professionals, [wa]s insufficient to create an issue of fact on a deliberate indifference claim")[.]

(Dkt. 645 at 38 (record citation omitted and case citation modified).) Plaintiff contends:

- 36 -

> [D]efendants knew [that] they had exposed [him] to hazardous conditions in the [isolation] units, that [he] was severely sleep-deprived and in pain and had been complaining of such, and[] particularly in Shaw's case, specifically knew [that he] needed mental health care for this[ situation] and utterly failed to provide this information to the medical and mental health [departments]. This [conduct] is deliberate indifference for which there is no qualified immunity.

(Dkt. 698 at 7.)   Plaintiff further maintains that Defendants' insistence that his electronic medical records from the facility "be treated as uncontested objective facts that are clearly established . . . is contrary to the Eleventh Circuit's ruling" in *Sears v. Warden, Okeechobee Correctional Institute*, 762 F. App'x 910 (11th Cir. 2019).   (Dkt. 698 at 3–4.)   *Sears* determined that medical records are "not the same as the 'incontrovertible' video evidence that courts must accept over contradictory sworn statements," as medical records are created by human beings, with "all their attendant mental infirmities, biases, and limitations."  762 F. App'x at 916–17.

The crux of Plaintiff's argument is that Defendants knew that the isolation conditions were "causing [him] injury and depriving [him] of sleep" and that he was not eating or drinking, but Defendants did not contact the medical or mental health department "to share what they knew nor just removed" him from the isolation units. (Dkt. 684 at 23.)  Further, once Plaintiff recovered on June 23, 2014, Klinger and Shaw returned him to the isolation units until he was allegedly permanently disabled.  (*Id.*)

Plaintiff disputes the medical records because he denies having been on a hunger strike, because a mental health specialist at the facility "would often copy and paste notes into the medical records" without a face-to-face meeting, and because he disputes the "account of the nurse's rounds."  (Dkt. 648 at 195–96; Dkt. 684 at 12.)

However, it is not disputed that Plaintiff stopped eating and drinking on June 17, 2014, and that he was moved to the ISO-2 unit on June 18, 2014. (Dkt. 648 at 184–85, 193.) Plaintiff also admitted that on June 18, 2014, he destroyed everything in his cell. (*Id.* at 181–82, 220.)

Plaintiff further acknowledged that on June 19, 2014, he met with Nurse Fuentes-Rivera to report that he "could not eat or drink and asked to be transferred to B-Pod." (Dkt. 630-65 at 15.) The parties agree that Todd conducted a mental health evaluation of Plaintiff on June 20, 2014, that Dr. Torres met personally with Plaintiff on June 23, 2014, that Dr. Torres told Plaintiff that Plaintiff was "missing too many meals," and that Dr. Torres placed Plaintiff in the infirmary to hydrate and to avoid "a detrimental health outcome." (Dkt. 635 at 3–4.) Plaintiff also acknowledged that he was taken to the medical unit on June 23, 2014, where he was able to eat and drink again and to rehydrate, and that he was discharged from the medical unit on June 24, 2014. (Dkt. 648 at 201–02.)

Plaintiff testified that he spoke with Klinger on May 29, 2014, about grievances that Plaintiff had filed, and on June 18, 2014, about Klinger's having watched Plaintiff on the video camera and wanting Plaintiff to stop screaming. (*Id.* at 172, 183–84, 211.) Plaintiff mentioned one other occasion when Klinger "shouted something down the hall." (*Id.* at 212.) Plaintiff also stated that on June 18, 2014, he told Klinger that the isolation conditions were "causing [him] pain and [were] responsible for [his] conduct." (Dkt. 630-65 at 14.) Klinger testified that he did not know what happened to Plaintiff between June 17 and 24, 2014, and that he was not aware that Plaintiff

stopped taking fluids.  (Dkt. 652 at 230.)

Plaintiff testified that he spoke with Shaw on June 6, 2014, when Shaw stated that no decision had been made about Plaintiff's housing, and on August 7, 2014, when Shaw "demand[ed] to know who had told [Plaintiff] about the abuse of George Zimmerman" in the facility.  (Dkt. 648 at 212–13.)  Plaintiff stated in his affidavit that he told Shaw on June 6, 2014, that the lights were causing him pain.  (Dkt. 630-65 at 13.)  Shaw testified that he became aware that Plaintiff stopped eating or drinking a "couple of days into" the situation, and that after he found out, he deferred the matter to the medical and mental staff for follow-up and to take corrective action.  (Dkt. 651 at 182, 185–86.)

Plaintiff must demonstrate a subjective knowledge of the risk of serious harm, which requires showing that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that Defendants "dr[e]w the inference."  *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099–1100 (11th Cir. 2014) (quotation omitted).  "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person kn[ew]."  *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted).  "An official disregards a serious risk . . . when he or she knows that an inmate is in serious need of medical care, but he or she fails or refuses to obtain medical treatment for the inmate."  *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (alterations adopted and quotation omitted).

Here, Plaintiff has failed to demonstrate that either Shaw or Klinger knew that he was in serious need of medical care or that they failed or refused to obtain medical treatment for Plaintiff. Neither Shaw nor Klinger was involved in Plaintiff's medical care, and there is no evidence that either of them was aware that Plaintiff was in serious need of medical care. Plaintiff has failed to show that Defendants had a subjective knowledge of a risk of serious harm to him or that they were personally involved in any acts of deliberate indifference to his serious medical needs. As a result, Plaintiff's claim of deliberate indifference to his serious medical needs fails because no causal connection was established between Shaw or Klinger's conduct and the alleged constitutional violation. Because Plaintiff has not set forth sufficient evidence to raise a genuine dispute of material fact regarding his claim that Shaw and Klinger were deliberately indifferent to his serious medical needs, Defendants are entitled to summary judgment on count two. *See Mattingly*, 777 F. App'x at 972. Even if Defendants had violated the Constitution, they would be entitled to qualified immunity, as Plaintiff has not shown a violation clearly established in the law. *See Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Th[e] evidence shows that [the inmate] received significant medical care while at the jail. Although [he] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference.").

## E. Count Three

Count three asserts a section 1983 claim based on a violation of the constitutional protection against cruel and unusual punishment, alleging that

- 40 -

Defendants "willfully[] and[] wantonly[] used a video[ ]camera to inflict humiliating punishment upon [Plaintiff]."  (Dkt. 250 at 24.)  Plaintiff contends that the "public display of torture is the quintessential punishment barred" by the Constitution.  (Dkt. 630 at 21.)  According to Plaintiff, "the undisputed evidence is that [D]efendants physically injured [him] and displayed images of [him] being injured on live video not only in public[]ly accessible areas of the [facility] like Control[ 2] but on screens intended to be seen by the public at Control[ ]1."  (Dkt. 684 at 25.)

Insofar as Plaintiff complains that his suffering could be seen through windows at the facility, testimony supports that the windows were tinted.  Klinger testified that in 2014, the windows around Control 1 and Control 2 were tinted.  (Dkt. 652 at 44–45.)  Todd testified that the windows in Control 1 were "tinted, so it[ was] hard . . . to see . . . what exactly [wa]s in there."  (Dkt. 653 at 33.)  Todd also testified that Control 2 was tinted such that individuals could not "see in there unless [they] put [their] face[s] up to" the glass.  (*Id.* at 35.)  Another mental health specialist at the facility testified that the monitors on the desks in Control 2 could be seen only if someone went over, bent down, and "look[ed] under the tinting."  (Dkt. 654 at 40.)  With regard to Plaintiff's allegations that Defendants broadcast his suffering on video, testimony supports that videos of suffering were not displayed to the public.  When asked why such videos were displayed, Shaw testified that he did not recall that they in fact were, (Dkt. 651 at 57–58), and Eslinger definitively testified that videos of suffering were not displayed to the public, (Dkt. 650 at 200 ("We never displayed those types of images [i.e., videos of suffering people] to the public or anybody else.")).

- 41 -

As indicated above, the Eleventh Circuit has explained that the "presence of a camera in the cells and the need for constant lighting . . . can be important for the prison to monitor particularly dangerous inmates at all hours." *White*, 709 F. App'x at 540. Moreover, "cameras in prison cells have long been accepted as constitutional and [inmates do] not have a legitimate expectation of privacy in [their] cell[s]." *Wright v. Waldera*, No. 15-cv-363-JDP, 2016 WL 270489, at *2, 2016 U.S. Dist. LEXIS 7307, at *5 (W.D. Wis. Jan. 21, 2016) (citing *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

Plaintiff has failed to provide evidence that video images of him were broadcast to the public. Although Plaintiff theorizes that visitors or inmates could potentially see video monitors in the control booths, it is speculation that visitors or inmates actually viewed him or any other inmate in the videos. He does not provide evidence of who (if anyone) viewed the footage or how much detail was visible. Further, there is no evidence that images of Plaintiff or any inmate in the isolation units were broadcast or disseminated anywhere except to the control monitors for viewing by personnel responsible for monitoring the inmates. Plaintiff does not demonstrate that the monitors were viewable to the general public or that anyone other than the staff actually viewed the monitors. Moreover, Plaintiff has failed to demonstrate that with regard to the allegations in count three, Defendants created a condition of confinement that inflicted unnecessary pain or suffering or that Defendants were deliberately indifferent to that condition. Plaintiff has not shown genuine issues of fact remain regarding the allegations in this count, and Defendants are entitled to summary judgment as to count three. At the very least, Defendants are entitled to qualified

immunity because Plaintiff has not demonstrated that a constitutional violation was clearly established.

## F.  Count Four

Count four brings a section 1983 claim based on an allegedly "unlawful search by video camera."   (Dkt. 250 at 25 (emphasis omitted).)   In Plaintiff's view, Defendants "cannot provide a legitimate or significant security reason for the video camera search, and . . . the intent of the search was . . . to impose a [c]onstitutionally prohibited punishment."   (Dkt. 630 at 22.)   Plaintiff asserts that Defendants "are completely unable to articulate what 'security threat' led to [him] being placed on [twenty-four]-hour camera monitoring."  (Dkt. 684 at 24.)

The Constitution protects against "unreasonable searches and seizures."   U.S. Const. amend. IV.   For constitutional purposes, a "search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."   *Kyllo v. United States*, 533 U.S. 27, 33 (2001).   In the context of incarceration, the Supreme Court has explained:

> A prison shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.  We strike the balance in favor of institutional security, which we have noted is central to all other corrections goals.  A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.  We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.  We believe that it is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

*Hudson*, 468 U.S. at 527 (alteration adopted and quotations and footnote omitted).  To

the extent that inmates possess a right to bodily privacy, the right is minimal. *See Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002) (describing a prisoner's constitutional right to bodily privacy as "minimal, at best"); *Bradford v. Kramer,* No. 15-cv-1405-JPG-SCW, 2017 WL 1169730, at *7, 2017 U.S. Dist. LEXIS 45706, at *21 (S.D. Ill. Jan. 27, 2017) ("As a detainee at the [j]ail, [the p]laintiff simply has no right to privacy."). Further, in most situations, even if "a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Klinger testified that a camera was placed in each isolation unit "to observe the inmate for inmate watches and for the safety and security of the inmate." (Dkt. 652 at 69.) He also explained that video monitoring was necessary for the security of inmates and for behavioral and medical reasons. (*Id*. at 94.) Shaw testified that continuous video monitoring was necessary for the safety and security of the staff and the inmates at the facility to ensure that the inmates were "not hurting themselves or anyone else." (Dkt. 651 at 57.) Shaw also mentioned that video monitoring helped keep inmates safe by allowing officers to watch the inmates to "make sure that . . . there was . . . nothing going wrong that would try to adversely affect [an] individual." (*Id*. at 130.) He also stated that Plaintiff was placed under continuous video monitoring to promote safety and security. (*Id*. at 140.)

Plaintiff's claim that his rights were violated because of the use of video cameras in the isolation units is deficient because the evidence shows that the facility's use of video cameras promoted the security interests of the facility's staff and inmates. The

record does not contain evidence to suggest that the cell cameras were used for any purposes other than safety and security. Plaintiff does not present evidence supporting that the camera's use was vindictive, harassing, or unrelated to any legitimate penological interest or indeed that the use of the video monitoring was anything other than part of the facility's routine security system intended to provide safety and security to the inmates and the facility's staff. Simply put, in this case, the use of cameras in the isolation units to observe all parts of the cell was in furtherance of the facility's strong interest in the constant observation of the inmates; a reasonable jury could not conclude otherwise from the record evidence. Plaintiff has failed to demonstrate that an unconstitutional search by video camera occurred. *See Wright*, 2016 WL 270489, at *2, 2016 U.S. Dist. LEXIS 7307, at *5. He has also failed to defeat qualified immunity because he has not shown a clearly established constitutional violation. *Cf. Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1072 (M.D. Ala. 2023) (observing that a "lack of proper video surveillance" could "creat[e] an unconstitutional risk of inmate violence" for failure to monitor inmates). Defendants are thus entitled to summary judgment on count four.

### G. Count Five

Count Five asserts a section 1983 claim involving an alleged denial of due process in *United States v. White*, case no: 6:13-cr-304-JA-GJK. (Dkt. 250 at 25.) Plaintiff contends that Defendants placed him "in conditions of confinement that rendered [him] unable to assist in [his] defense" in that criminal case, which resulted

in Plaintiff's conviction.  (*Id.*)  He elaborates in his motion for summary judgment, asserting that Defendants "inflicted such severe sleep deprivation on [him] that [he] was rendered incompetent and unable to review the discovery, . . . [which] led to evidence not being presented and [his] being unable to testify."  (Dkt. 630 at 23.) Plaintiff contends that "[s]tarting no later than the attorney meeting of May 28, 2014, [he] became increasingly unable to discuss his defense . . . with his counsel" and that "[a]fter June 24, 2014, [he] was no longer able to intelligently discuss the charges at all."  (*Id.* at 12–13.)  In Plaintiff's view, "Shaw and Klinger specifically intended to prevent [him] from defending" his criminal case "when they ordered [him] tortured." (*Id.* at 23.)

Plaintiff's assertion that Defendants' actions interfered with his ability to assist in his defense calls into question the fundamental fairness of his trial and challenges the constitutionality of his conviction. *See United States v. Mitrovic*, 890 F.3d 1217, 1221 (11th Cir. 2018) ("The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (alterations adopted and quotation omitted)); *United States v. Harris*, 703 F.2d 508, 513 (11th Cir. 1983) (reversing a conviction when the defendant's "fundamental right to a fair trial was violated"). When a convicted plaintiff seeks damages in a civil rights lawsuit, the "court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been

invalidated." *Heck v. Humphrey*, 512 U.S.477,  487 (1994); *see Hall v. Merola*, 67 F.4th 1282, 1285 (11th Cir. 2023) ("*Heck* precludes a convicted person from pursuing a civil claim for damages under [section] 1983 if, because of what the elements of his civil claim require him to prove, a decision in his favor on that claim would necessarily call into question the validity of his criminal conviction."); *White v. Fulton County*, 760 F. App'x 915, 917 (11th Cir. 2019) ("*Heck* bars collateral attacks on convictions or sentences in [section] 1983 actions.").  *Heck* "strips a district court of jurisdiction" over section 1983 claims "brought by an imprisoned plaintiff" that require the invalidation of the plaintiff's conviction or sentence.  *Dixon v. Hodges*, 887 F.3d 1235, 1237 (11th Cir. 2018) (applying de novo review because a "dismissal for lack of subject matter jurisdiction presents a legal question").  Although Defendants' summary judgment motion does not argue that *Heck* bars count five, (*see* Dkt. 645 at 43 & n.22),[9] a district court may raise jurisdictional issues sua sponte, *see Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).  Because the success of count five would necessarily imply the invalidity of Plaintiff's conviction, the count is due to be dismissed.  The court thus grants Defendants summary judgment as to the count.  *See Edwards v. Balisok*, 520 U.S. 641, 646 (1997) (applying *Heck* in the prison disciplinary context to a prisoner's claim that "he was completely denied the opportunity to put on a defense" because the claim "would, if established, necessarily imply the invalidity" of his punishment).

---

[9] Instead, Defendants maintain that no evidence supports Plaintiff's inability to assist in his own defense for the criminal trial.  (*See* Dkt. 645 at 43 & n.22.)

- 47 -

## H. Count Six

Count Six advances a First Amendment retaliation claim through section 1983 under the theory that Defendants maintained Plaintiff in isolation "in retaliation for [his] participation in lawful acts of speech, association, [or] assembly," including acts six or more years before his imprisonment. (Dkt. 250 at 25–26.)  In his response to Defendants' motion for summary judgment, Plaintiff characterizes Defendants as "argu[ing] extensively that they tortured [him] in the [isolation] cells because [he] had participated in the FBI's fake neo-Nazi movement six years earlier."  (Dkt. 684 at 27 (quotation omitted).)  Plaintiff maintains that "[t]he First Amendment forbids prison officials from retaliating against prisoners for exercising their right of free speech." (*Id.* (quotation omitted).)

To prevail on a First Amendment retaliation claim, a plaintiff must establish three elements: (1) "his speech or act was constitutionally protected," (2) "the defendant's retaliatory conduct adversely affected the protected speech," and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (quotation omitted). Shaw testified that Plaintiff was placed in isolation because the USMS requested that placement and that Shaw lacked the ability to override the USMS's request as to Plaintiff. (Dkt. 651 at 159–60.)  In addition, Shaw stated in his affidavit that upon review of the USMS's report about Plaintiff, "Klinger in the intelligence unit then placed [Plaintiff] on administrative lockdown pursuant to the [report], which occurred on May 20, 2014, within a week from [Plaintiff's] intake." (Dkt. 667 at 2.)  Klinger

testified that he ordered Plaintiff placed on administrative lockdown and that Plaintiff was placed in the isolation units in accordance with the USMS's report, which stated that Plaintiff was a security concern with gang and sovereign citizen affiliations, white supremacist beliefs, and leadership in a neo-Nazi organization.  (Dkt. 652 at 161.) According to Klinger, Plaintiff was placed in the isolation units "[f]or the safety and security of the facility, as well as the inmates," based on the USMS's report.  (*Id*. at 164.)

Even when viewed in the light most favorable to Plaintiff, the record evidence therefore indicates that his placement in isolation stemmed from safety and security concerns originating from the USMS.  Plaintiff has not advanced anything akin to a cat's paw theory pursuant to which a retaliatory motive on the part of the USMS could be attributed to Defendants.  *See Gilroy v. Baldwin*, 843 F. App'x 194, 197 (11th Cir. 2021) ("assuming arguendo that [such a theory] applies in the [section] 1983 context"). Moreover, Plaintiff has not provided evidence that Defendants had retaliatory reasons for placing him in the isolation units or that the isolation was, in any manner, causally connected to his constitutionally protected speech or acts.  *See Sears v. Bradley*, 667 F. Supp. 3d 1344, 1368 (M.D. Ga. 2023) ("[The plaintiff's] speculation alone [as to a retaliatory motive] is insufficient to establish causation or to create a genuine issue of material fact.  Thus, [the defendant] is entitled to summary judgment on [the] First Amendment retaliation claim." (footnote omitted)).  Nor has Plaintiff demonstrated, with regard to the qualified immunity analysis, that Defendants violated clearly established law.  "It is particularly difficult to overcome . . . qualified immunity . . . in

the First Amendment context." *Gaines*, 871 F.3d at 1210 (citing binding Eleventh Circuit precedent). To the extent that Plaintiff "relies on the broader principle that the act of retaliation for the exercise of constitutional rights is clearly established as a violation, . . . this general principle is too broadly stated to control." *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (quotation omitted). At bottom, Plaintiff has not shown genuine issues of fact regarding count six, and thus, Defendants are entitled to summary judgment on the count.

## I. Count Nine

Count Nine asserts an IIED claim. (Dkt. 250 at 26.) Plaintiff alleges that Defendants "willfully[] and[] wantonly[] caused [him] serious emotional distress[] and[] physical injury[] by placing[] and[] maintaining[ him] in the [isolation] conditions from May 20, 2014, to November 30, 2014." (*Id.*) Plaintiff argues in his motion for summary judgment that Defendants subjected him "to extreme sleep deprivation, inducing psychosis, leaving [him] unable to eat or drink until [he] collapsed," that they videotaped Plaintiff's suffering and "broadcast[] it to the public," and that they did so "for no reason except that they thought [that] their badges would let them get away with" this misconduct. (Dkt. 630 at 25.) Plaintiff claims that the misconduct "was obviously outrageous"—"something that civilized nations abandoned centuries ago." (*Id.*)

To state an IIED claim under Florida law, a plaintiff must satisfy four elements: (1) the defendant's conduct was intentional or reckless, (2) the defendant's conduct

was outrageous, (3) the defendant's conduct caused the plaintiff's emotional distress, and (4) the emotional distress was severe. *Williams v. Worldwide Flight Servs., Inc.*, 877 So.2d 869, 870 (Fla. Dist. Ct. App. 2004). With regard to the second element, the Supreme Court of Florida has explained:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985) (quotation omitted). Whether alleged misconduct satisfies the second element is a legal, not factual, issue that courts evaluate objectively, regardless of the plaintiff's subjective response to the misconduct. *Corbin v. Prummell*, 655 F. Supp. 3d 1143, 1165 (M.D. Fla. 2023).

The standard for outrageousness concerning IIED claims under Florida law is "extremely high." *Id.* (quotation omitted); *see Geidel v. City of Bradenton Beach*, 56 F. Supp. 2d 1359, 1363–64, 1368 (M.D. Fla. 1999) (concluding that allegations made by a male plaintiff and a female plaintiff did not meet "this incredibly high standard" when two defendant police officers purportedly did the following: entered the incorrect residence in response to a domestic violence call, disregarding neighbors' statements that the officers had done so; conducted multiple warrantless searches of the residence; arrested the male plaintiff and threw him to the ground when he asked for the reason; handcuffed him tightly enough to restrict his circulation and laughed when he

complained of the tightness; "jerked [him] off the ground with force, causing [him] extreme pain in his right shoulder"; "jerked [his] body from side to side and up and down, while dragging [him] off to the waiting police car"; reentered the residence without a warrant, pushing the female plaintiff aside to do so; "struck her in the forehead with [a] fist, leaving a large red knot on her forehead"; reacted to the male plaintiff's kicking of the police car's window by "grabb[ing him] out of the car, thr[owing] him on the ground, and plac[ing] metal leg shackles on his feet" (which "connected to his handcuffs at his back"); repeatedly lifted him "up and down, dropping and slamming his body" into the police car; transported him to jail; dragged him out of the police car; and "left [him] lying face down, in shackles, on the concrete for approximately forty . . . minutes"); *see also Andrews v. Marshall*, No. 2:16-cv-814-FtM-99MRM, 2019 WL 11638833, at *8, 2019 U.S. Dist. LEXIS 231923, at *21–22 (M.D. Fla. May 8, 2019) ("[I]n [*Rubio v. Lopez*, 445 F. App'x 170, 172–73, 175 (11th Cir. 2011)], after arresting a defendant, officers forced him down onto hot asphalt and hog tied him, leading to second-degree burns on his face and chest. Yet the Eleventh Circuit held the conduct was not outrageous. Neither was the conduct here." (citations omitted)), *aff'd*, 845 F. App'x 849 (11th Cir. 2021). Given the high standard for outrageousness, "[c]ourts have upheld a cause of action for [IIED] only in extremely rare circumstances." *R. W. v. Armor Corr. Health Servs.*, 830 F. Supp. 2d 1295, 1304 (M.D. Fla. 2011) (quotation omitted).

Here, Plaintiff has failed to demonstrate that Defendants' conduct was sufficiently outrageous to satisfy the high standard for IIED in Florida. As discussed

above, even when viewed in the light most favorable to Plaintiff, the record evidence

indicates that he was placed in the isolation units due to safety and security concerns,

that Defendants attended to his health, that although video monitoring was necessary

to maintain order in the facility, windows were tinted, and that Plaintiff's suffering

was not displayed to the public.  Plaintiff has presented no evidence that Defendants'

conduct was "so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency."  *See McCarson*, 467 So. 2d at 278–79.

> Further, Florida law provides:

> An officer . . . of the state or of any of its subdivisions may not be held
> personally liable in tort . . . for any injury or damage suffered as a result
> of any act, event, or omission of action in the scope of her or his
> employment or function, unless such officer . . . acted in bad faith or with
> malicious purpose or in a manner exhibiting wanton and willful disregard
> of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).  Determinations of bad faith, malice, and wanton and willful

disregard in this context involve subjective inquiries into defendant officers' states of

mind.  *See Butler v. Gualtieri*, 41 F.4th 1329, 1336–37 (11th Cir. 2022).  That said, the

record does not support Defendants' bad faith, malice, or wanton and willful

disregard.  Because a reasonable juror could not conclude from the evidence that

Defendants acted with bad faith, malice, or wanton and willful disregard when they

engaged in the conduct alleged in count nine, Defendants are entitled to immunity

under section 768.28(9)(a).

> Given the above, summary judgment for Defendants is proper as to count nine.

## J.  Count Ten

Count Ten alleges that Defendants battered Plaintiff "by wantonly[] and[] willfully[] striking [him] in the eyes with a painfully powerful light during the period [from] May 20, 2014, to November 30, 2014." (Dkt. 250 at 27.) Plaintiff asserts in his motion for summary judgment that Defendants "placed [him] in the [isolation] units knowing that [he] would have offensive physical contact with a light." (Dkt. 630 at 25.) According to Plaintiff, "that offensive contact injured [him]." (*Id.*)

Under Florida law, "[b]attery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Quilling v. Price*, 894 So. 2d 1061, 1063 (Fla. Dist. Ct. App. 2005). Plaintiff alleges that the harmful or offensive contact committed by Defendants was through "a painfully powerful light" "striking [him] in the eyes." (Dkt. 250 at 27.) Plaintiff has not demonstrated that Florida law recognizes such a theory of battery. *See Stafford v. Hayes*, 327 So. 2d 871, 872 (Fla. Dist. Ct. App. 1976) (affirming summary judgment for the defendants when the plaintiff brought an assault and battery claim under the theory that the light from the defendants' cameras and floodlights hurt the plaintiff's eyes, and reasoning that "the injury to [the plaintiff]'s eyes was not foreseeable by the [defendants] as a substantially certain result" of the light). To the extent that such a theory is cognizable under Florida law, the record does not support that Defendants could foresee Plaintiff's injury as a substantially certain result of the continuous lighting used to monitor the facility. *See id.* The record does not support, for example, that Defendants themselves shined light directly into Plaintiff's eyes or

prohibited him from closing, or otherwise covering, his eyes to guard against the light.

Moreover, as explained above in connection with count nine, section 768.28(9)(a) provides immunity to Defendants, as the record evidence does not establish that Defendants acted with bad faith, malice, or wanton and willful disregard. Fla. Stat. § 768.28(9)(a). Instead, the evidence shows that the complained-of lighting was needed to monitor the facility. For example, Shaw testified that the visibility afforded by the twenty-four-hour lighting in the isolation units was necessary for safety and security "[t]o make sure that [the inmates] were[ not] hurting themselves or doing anything that would cause potential harm to anybody else." (Dkt. 651 at 56–57.) For his part, Klinger testified to working days and thus not knowing what happened at night regarding the lighting in the isolation units. (Dkt. 652 at 33.) He further testified that "[i]t was not [his] responsibility . . . as far as when the lights were operated." (*Id.* at 34.)

Plaintiff does not present evidence that Defendants intentionally battered him with light or that Defendants' actions deprived them of the immunity conferred under section 768.28(9)(a). Consequently, the court grants summary judgment for Defendants as to count ten.

### K. Defendants' Counterclaim

Defendants have filed a counterclaim for incarceration costs under Florida's Civil Restitution Lien and Crime Victims Remedy Act of 1994, Fla. Stat. §§ 960.29–960.297. (Dkt. 251 at 11–12.) Under the statute, "[u]pon conviction, a convicted

offender is liable to the state and its local subdivisions for damages and losses for incarceration costs and other correctional costs." Fla. Stat. § 960.293(2); *see* Fla. Stat. § 960.291(5)(b) (defining damages and losses to include incarceration costs). A local subdivision can petition for a civil restitution lien to recover for costs incurred at the correctional facility that the subdivision maintains. Fla. Stat. § 960.292(2). Further,

> [i]f the conviction is for an offense other than a capital or life felony, a liquidated damage amount of $50 per day of the convicted offender's sentence shall be assessed against the convicted offender and in favor of the state or its local subdivisions. Damages shall be based upon the length of the sentence imposed by the court at the time of sentencing.

Fla. Stat. § 960.293(2)(b); *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall['] . . . normally creates an obligation impervious to judicial discretion."). By providing for liquidated damages, the statute "impos[es] a per diem charge on convicted offenders" regardless of damages actually incurred. *Ilkanic v. City of Fort Lauderdale*, 705 So. 2d 1371, 1372–73 (Fla. 1998); *cf. Damages*, Black's Law Dictionary (12th ed. 2024) (in contact law, defining "liquidated damages" as "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches," and explaining that "[i]f the parties to a contract have properly agreed on liquidated damages, the sum fixed is the measure of damages for a breach, whether it exceeds or falls short of the actual damages"); *Liquidated Amount*, Black's Law Dictionary (12th ed. 2024) ("[a] figure readily computed, based on an agreement's terms"). The statute "does not limit costs to those incurred after conviction," *Riggins v. Beseler*, 568 F. App'x 850, 854 (11th Cir. 2014), and authorizes "[t]he state and its local subdivisions, in a

- 56 -

separate civil action or as counterclaim in any civil action," to "seek recovery of" incarceration costs, Fla. Stat. § 960.297(1).

Defendants seek $11,200, calculated at $50 per day of Plaintiff's incarceration from May 13 to December 23, 2014. (Dkt. 251 at 12.) Plaintiff makes only one argument concerning the counterclaim: he contends that he "was housed at the [facility] from May 13 to December 23, 2014, pursuant to a contract between the SCSO and USMS." (Dkt. 684 at 18.) "Pursuant to that contract," Plaintiff argues, "neither the USMS [n]or the SCSO had any expectation that the SCSO would incur any damages, costs[,] or expenses associated with housing [him] or any other prisoner not covered by the contract." (*Id.* at 18–19.) The record does indicate that the USMS entered into a written agreement with the facility on October 6, 2009, under which the USMS agreed to pay a per diem rate of $66 to the facility. (Dkt. 630-10 at 2; *see* Dkt. 657 at 33 (the deposition testimony of a 2014 USMS employee about the agreement).) However, any payment by the USMS notwithstanding, Florida law authorizes the correctional facility to recover for the costs associated with Plaintiff's incarceration. *See* Fla. Stat. § 960.293(2). Because Plaintiff "was incarcerated at the [facility] and later convicted of a [related] offense," summary judgment for Defendants on the counterclaim is proper. *See Riggins*, 568 F. App'x at 854.

## CONCLUSION

Accordingly:

1. Plaintiff's motion for summary judgment (Dkt. 630) is **DENIED**.

2. Defendants' motion for summary judgment (Dkt. 645) is **GRANTED**.

3.  The Clerk is **DIRECTED** to enter judgment accordingly, terminate any pending motions and deadlines, and close the case.

**ORDERED** in Orlando, Florida, on March 30, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Unrepresented Parties
Counsel of Record